Good morning. May it please the Court, my name is Cliff Gardner and I represent the petitioner Mr. Pham. There is much my colleague, actually may I reserve five minutes for rebuttal Your Honor? Thank you. There is much my colleague from the Attorney General and I disagree about, I'm sure the Court is familiar with that from the briefs, but I'd like to start my comments today with two points of agreement because I think it puts into focus what we do disagree about. We agree that the notes on which Mr. Soto prepared his gunshot residue test, those notes were never disclosed to trial counsel, they were never disclosed in post-conviction and they were never disclosed in state post-conviction when I asked for an order from the state Supreme Court and they were never disclosed in the district court. They have never been disclosed to this day. They have been suppressed from day one. Do they continue to exist? As far as I know, they do. My expert, Your Honor, called their expert, he didn't say they don't exist, he said get a court order. So as far as I know, they do. The second point, and this is something I have to concede, is that without those notes, I can't establish the materiality prong for the Brady claim or indeed the prejudice prong for the Strickland claim because I need to know what those notes say. But what would be, let's assume that state of facts, then what do you have to show, assuming that you did get those notes, what was the most or the best that they could do for you? Indeed. And that ultimately is what the point of disagreement is. Should I get the notes? The State says even if they show, what Petitioner hopes they show, it isn't good enough to get discovery. It isn't good enough to get relief. And I have two comments on that defense, as Your Honor's question phrases it. One is a legal comment and one is a more specific factual comment. And hopefully one of those two will strike at the core of your question. The legal comment is indeed the State has suggested there may be alternatives. There are limits to gunshot residue testing. It may not show that indeed Twan fired a gun. It could perhaps show he was in a room where a gun was fired or he had contact with gunshot residue. So, they say, it can't possibly exculpate. There is an alternate explanation. And indeed, they come forward with two explanations as to how Twan could have got that gunshot residue. And my first point is simply this. The fact that there may be an alternate explanation is not sufficient, even if we were talking about the Brady issue itself, for the State to suppress that evidence. But we're not talking about the Brady issue. We're talking about good cause for discovery. I'd invite the Court's attention to the Murdoch case, Murdoch v. Castro, which is a very similar case where the Court faced a confrontation issue, but before it faced the issue, it said, wait a minute, there's something we need to get, and that is the letter that counsel is saying gives rise to the confrontation claim. Go back to district court, use your process, get the letter, and then we'll talk about the merits. I think the existence of an alternate explanation does not undercut the good cause required for discovery. And indeed, I think that's the teaching of Bracey v. Bramley, the Supreme Court case on discovery in habeas matters. Bracey was somewhat of an unusual case. It's the case where a defendant was sentenced to death by a judge who it turned out several months later was indicted and convicted of corruption. And defendants sought discovery in habeas, and he said, I want to see some materials relating to that judge's trial because I think it'll show that he was biased against defendants who didn't bribe him. And the State came forth with an alternate explanation and said, no, no, even if it shows that you can't win, because we would expect the judge to actually be consistently in favor of defendants so it didn't look suspicious. And the Supreme Court noted the alternate explanation. They said defendant's theory was speculative. He may not be able to prove it, but he was entitled to discovery. At this point, I'm hearing you, and as I kind of read through the – I found this a difficult case because I had trouble keeping all the characters straight and the testimony's difficult and it shifts back and forth, and the testimony from Mr. Soto is long and occasionally, I'll say, difficult. Having said all that, it occurred to me that it's possible that at this stage you would be content not to get a ruling on Brady but simply to get your hands on the notes and see what's there. That's exactly what I'm asking for, not a ruling on Brady. That's why I'm inviting the Court's attention to Murdoch. I think it's too early for a ruling on Brady. I just want to see what's there. And then your argument is you'll be in a position to make a Brady argument if it exists based on this. And if it doesn't exist, I won't have a Brady claim. It's just that simple. I stand before this Court many times and I ask for something big. So I've asked this Court to vacate death sentences. I've asked this Court to reverse or grant habeas relief in murder cases. But I'm not asking for any of that today. I'm just asking to see the papers. And we all agree that I, at least my predecessor in interest, was entitled to see those before trial. He just didn't get them. He asked for them informally. The district judge here says that he sought – unsuccessfully sought a court order, but I saw nothing in the record to show that he sought a court order. And that's right. The district judge just made a blunder on that. I don't think counsel will argue anything different. I saw the informal request in the record and I see nothing beyond that in the sense of attempt to get a court order. I think it just didn't happen. And in his later affidavit when he says, well, it's not in the file, that probably means I never got it. And he makes no mention of having tried to get a court order. The district court's error comes from a declaration I submitted. And in explaining the course of my attempts to get it, I said I asked for it after my informal request. So she's just flipping who asked for what? Exactly, Your Honor. And so let me talk a little bit more specifically about why there's good cause in this case factually. Obviously, the defense theory of the case is that Twan was the second shooter. And let's look at the evidence that ties Twan to this case. Jim Duncan, who was the ex-helicopter pilot from Vietnam and happened to be on the scene, doesn't know Petitioner. That I understand, but I'm familiar with what the – this sort of relates back to your prior point. All you're asking for is information so you can decide if you have a claim. Correct. But it's not – I think it's a little confusing exactly what the standard amounts to and how they sort of conflate together. Because at the end of the day, the question is whether there's enough to say that there was a miscarriage of justice. Or a Brady violation. Yeah, for a Brady – yeah, a Brady violation. Yes. But the question I have is assume, as I understand what you hope to get out of this, is that the GSR test will – would have allowed Soto to say something stronger than he did. Are you contending that even if – that those notes are going to push it into a posture where Soto would have testified that absolutely he fired the gun? No. Or that he even fired a gun? No gunshot residue expert could say that. But I will say this. It would have strengthened the argument that whatever he had on his hands is indicative that he could have been the shooter. Well, in light of the evidence that tied Twan to the crime that's already in the record, it would have immeasurably strengthened that argument. Let's remember what the prosecutor did with Soto's testimony. Again and again and again he told the jury, you don't have to worry about Twan and don't worry about that gunshot residue analysis. It's inconclusive. So he relied on that repeatedly. Had defense counsel been able to get this – these notes and had they shown that indeed it was positive for gunshot residue, then the dynamics would have been vastly different. On the defense side, here's what we would have had. We would have had Jim Duncan's identification of Twan. We would have had the two independent witnesses that identified the clothing of the second shooter that matched Twan. We would have had Twan's car leaving the scene from the license plate that was taken. We would have had Dong Chi saying at the new trial motion that he saw Mole and Twan with the guns. That's what existed in the record. We would have had a gunshot residue test that possibly an expert can say indeed shows he had contact with gunshot residue, either by firing or by handling. We would have had something that I don't think the parties have properly focused on yet, and that is, Twan was interviewed as he was arrested. And as officers often do, they are insincere in some of the facts that they suggest. And in the interview of Twan, they said, hey, this gunshot residue has come back and it's yours. What do you say? Now I don't think they'd known. I don't think they had the gunshot residue test yet, but it's a fairly typical interrogation technique. I'm sure the Court's familiar with it. And Mr. Twan didn't say, well, I was in a car with someone who had a gun. He didn't say I handled the gun. He didn't say I shook hands with someone who handled a gun. He said it can't be. It's not me. I had nothing to do with guns. So we would have had that also in terms of the mix. I'm not sure how that helps you, denying. Why would he say he was in a car with somebody who did that? It wasn't me. I'm sorry? It wasn't me. It wasn't I. Well, the point is he denied anything that could now be used as an alternate explanation for how that gunshot residue is on his hands. Well, I'm not. You could argue that. Well, and that's a negative pregnant argument, I guess. Yes, it is. And I think that's my point, is that it could have been argued. But without  it. And it is undisputed that he was in that tightly packed car that drove away. That who wasn't in it? I'm sorry, Your Honor. Twan Wong was in that car. I mean, that is an explanation that could be advanced. It's just he didn't advance it. Correct. That's exactly right. And indeed, the state relies on that, saying, well, he could have gotten it in the car and relies on Mr. Duncan's testimony. It's a little bit dicey because Mr. Duncan didn't say he saw one of the shooters get into the back of the car. He said, I saw two shooters get into the car, and one of them was Twan. Mr. Duncan's testimony doesn't show that Twan was in the presence of a shooter. It shows that he was a shooter. So to rely on his testimony as an explanation for the gunshot residue is a little bit, I think, I'll just leave it at dicey. I think it is dicey. It may well be, and I think this gets at your question, Judge Fischer, and there's a danger here, I think, of allowing the good cause requirement for discovery to serve as a Trojan horse for the merits of the claim. I'm not asking you for a resolution of the Brady claim. Like the defendant in Bracey, where the Supreme Court said it may well be that he can't prove it, it may well be that I can't. I don't think that'll be the case, but it may well be that I can't. But like the defendant in Bracey and like the defendant in Murdoch, at least my client, before he serves 29 years to life, should have a chance to see those notes. They've been suppressed from day one, and all I'm asking for is that opportunity. Unless there's other questions, I'm happy to submit an appending rebuttal. You've got that referral rebuttal, and you may have something you want to say in response. Good morning, Your Honors. Glenn Pruden, Deputy Attorney General for the State of California, on behalf of Respondent. May it please the Court, Mr. Pham, through Mr. Gardner, focuses both his brief and his argument on whether or not the district court abused its discretion. However, there's one problem with that, and that's the COA wasn't granted on that issue. But the COA was granted on Brady, and this may or may not be included within Brady. Do you think it's not included within the COA? That is to say, he wants this because he thinks it's relevant to the Brady claim. The issue of that, as it was framed by the district court in the grant of the COA, was whether or not the state court's determination for rejecting Pham's Brady claim was an unreasonable one. And that's entirely different than this procedural issue. You know under our rules that we can expand. Yes, Your Honor. Do you want us to expand it and give you a chance to brief the question? Out of an abundance of caution, Your Honor, I already briefed that issue. Okay. However, I just thought it was something I did need to point out to the Court. And a fair thing to point out, too. Your Honor, basically, Mr. Pham's entire case is based on speculation. He speculates that if he's somehow allowed to examine Mr. Soto's notes, he might – and I emphasize the word might – find data that would contradict Mr. Soto's testimony at trial. In other words, that the GSR, the gunshot residue test, were inconclusive. And I would ask the Court to, in its examination of the entire record, what legitimate support does he provide for his theory? You know, I've got a question that may or may not tie into what you're about to say. But at the very beginning of your statement of facts, the first sentence in your brief says, Victim Tong Van Nguyen was murdered by three people. Where do you get the three people? There is Mr. Pham, his co-defendant, Nguyen, I believe is how it's pronounced. And then also the individual by the name of Mole. But the testimony we have, both from Mr. Duncan and from the victim's brother, is that there are two shooters. Do you have testimony that there are three people? One – I believe Nguyen was convicted on the – as an aider and abetter theory, the other co-defendant. So there are three people guilty of the murder. Oh, I see. So the theory – But there are also three weapons found. I see. So the theory is that the co-defendant, who's not in front of us, Mr. Tong Van Nguyen is not a shooter. He may – Mr. Nguyen may have been a shooter as well, because three weapons were found. There was a .357 found in the dumpster, there was a .22 revolver, and there was also a semi-automatic .22 Ruger, I believe. But the testimony – just to make sure I understand the basic scenario as we got the gun done, that they see two shooters, correct? They don't see three shooters? Fleeing the scene, I believe. Correct. Right. There you go. They're both seeing three – two shooters fleeing the scene. Is there any – is there any – is there any eyewitness that there were three shooters? I don't – that doesn't mean there's no evidence, but is there any eyewitness testimony that there were three shooters? I don't recall any off the top of my head, Your Honor, outside of the conflicting gang member testimony about who was all involved and who went outside at the time of the shooting and so forth. I've tried to read a fair amount of the testimony, but it's a long trial and I confess at this point I've not read it all. What testimony is there against not Mr. Pham at the moment, but rather against his co-defendant? I mean, what – what – what – what implicated him? I think the strongest implication of the co-defendant was the motive, that he had been beaten up several days earlier because he had kept out the victim's sister beyond curfew. And motive, and then if I'm talking detective and I was – and opportunity? I mean, what – Yes, sir. Opportunity, he was seen in the company of the other shooters and so forth. Okay, got it. Obviously, when you have gang situations like this, you've got people pointing fingers every which way trying to confuse the issue. And the jury – however, the jury, it has to be borne in mind, the jury was presented with all this conflicting testimony, and they obviously resolved the difference in the facts, you know, looking at them. Right. And I understand – and I think I got this right, and the other side can set me straight. I think I understand the theory of their defense, which at trial, and I think now is, they're not trying to say that the co-defendant, Mr. Song Wong Nguyen, is innocent and everybody seems to assume that Mole is guilty. This defendant is merely saying, it wasn't me, it was Tuan Wong. I think that's the theory of the case. That's the theory of the case. However, Your Honor, the jury has resolved that, and what he's trying to say is that if somehow – if I get my hands on Mr. Soto's notes, you know, the State has withheld something exculpatory, but he's not shown that at all. Well, how can he? I mean, that's the problem I have. How can he know what's in the notes unless he gets access to them? Well, Your Honor, I think the more fundamental question that needs to be asked in relation to what you've just asked me, though, is how does he know there's a problem with what Mr. Soto has testified to at all? How does he know what the testing methodology was in the first place? That was test – that was testified to by Mr. Soto. He used a scanning electron microscope, and he talked about the swabbing that was done. He received the swabbed results from the – from the police. I don't understand why the report wasn't made available at the time of trial. The report was made at – there was a report generated of his findings, and that was made available to the House, Your Honor. What he's asking for now is the raw data and any lab notes that Mr. Soto had. Because experts have been known, even in the O.J. Simpson case, to make misanalysis in their crime labs. The FBI has been stunningly shocked to find out that – and Texas has all of these problems with its experts that have testified. So I have a little bit of trouble saying, unless he can show what in the notes would specifically impeach, I have trouble saying, well, that's too bad, because you're – you know, you can't – you're just speculating. Well, it's an informed speculation, as I read about it, in the record. At least the argument they make is that there's this question of whether or not titanium versus barium could have been misidentified. And if there were errors that surfaced by those notes, that Soto's inconclusive opinion might have been stronger. I also understand, however, that he could not have testified that Twan was indeed the shooter. All he could do was – as I understand it, I'd be willing to be corrected – is what the likelihood or the probability, I should say, that the guy who was originally identified indeed showed gunshot residue, which would be consistent with the other testimony. Absent that, they had a weaker case to pin the – pin the rap on him. Well, really, Petitioner's argument goes both ways, Your Honor. In regard to the point you raise about the titanium and the antimony that Mr. Soto testified to, on the one hand, Mr. Moses, his expert, wants to accept that as true, but in the next breath he says, well, they're easily mistaken – titanium is easily mistaken for barium. Yet if you look at Mr. Soto's findings, and the way he reported out the gunshot residue that – or not the gunshot residue, but the results of the test that he found on both Pham's hands and Mr. – I think it's Jiang, the other person who was tested. He is capable of discriminating between barium and titanium. So I think that's a red herring that he's throwing out. Capable of may be different from did. And did – well, yes, sir. I mean – But that's the issue, did. And so I don't see that as – as any claim indicative that Mr. Soto has done something wrong. I have a different question, and that is, these notes have been asked for from the beginning. We wouldn't have to be here if you'd handed them over at the time of trial, pretrial, if you'd handed them over last week. Why don't you just let them have a look? The State's position is that the notes are not exculpatory information, and what we would be faced – I understand the State's position, and I'm asking you a different question. Why don't you let them have a look? Because if we had to turn over something to a defendant every time he says, well, I think there may be something exculpatory in there, we'd be turning over the entire file, Your Honor. Does the State ever litigate where experts on the other side give testimony and report? Your Honor, Mr. Soto was called by the defense. No, no, I'm just – my question is, does the State of California ever get in situations where it litigates and is confronted with experts for the other side who present expert reports? I assume the State does. Yes, Your Honor. Does the State seek discovery of the underlying information? It's been my experience here and in other states and in the military, yes, we do. Well, so why? Because you want to know whether or not the end product, the testimony, is in fact reliable, whether there's some flaw in it in methodology or the like. So it isn't just somebody coming in and saying, well, this is a fishing expedition. It seems to me in this case, when a gunshot residue test is done, that's normally if the State had liked the results, would have proffered it itself and doesn't. That sort of is not just fishing expedition. It seems to me it's relevant to find out what the methodology and notes were as is substantiated by the notes. It just seems part of the scientific inquiry one would want to make. And it may well be, Your Honor. However, we're not at that point in the proceedings any longer. We're here litigating a breaking point. The question was, the question, I'm following up on Judge Fletcher. Why wasn't it given? And your answer was, well, it's just sort of a fishing expedition. I know you weren't the trial. I'm not the DA. I don't know the DA. I have never met the gentleman. But your answer, if we had to, every time we got this request, we'd have to hand them over and it's a big nuisance. Well, it's a big nuisance to come argue in front of us. For us. I like it. But it's best to the State to brief this argument, to resist it at this point. So if you're merely saying it's a darn nuisance for the State to turn it over, they've chosen between two different kinds of big nuisance. Well, Your Honor, I'm saying more than that. I'm saying he hasn't made the showing that Rule 6, Bracey and all Bracey's progeny, all the Rule 6 cases, say he has to. And that is that even he has to show there's a likelihood that he would succeed in his claim. And I submit to Your Honor that when he litigated the Brady claim before the State court, that the State court was cognizant of the controlling law. Now, what kind of litigation did he do in front of the State court on the Brady case? I'm sorry, sir? What kind of litigation did he do before the State court on the Brady claim? He filed a State habeas petition. In what court? Supreme Court? Ultimately to exhaust it, yes, Your Honor. But I think that was the only place he filed. And then he got a postcard denial. I think that's right. I may be misstating, but I think I've got that right. I don't think he was in the superior court with a sort of a, let me have some discovery and so on. He went back to exhaust, and the Supreme Court gave him a postcard denial. I believe he also asked for the material from the State court, and had the Supreme Court felt that there was good cause, it would have issued an OSC and referred the matter out to the referee in similar fashion as, you know, would occur in district court for a hearing on the matter. And I think that implicit in the denial and the way that the Supreme Court handled the case is the fact that they feel or felt that Mr. Phan did not make the adequate good cause showing, because even if you get a gunshot, you need to know the good cause. I think I know the answer to this, but is the good cause necessary in State court to get discovery? Controlling on Federal court is what's good cause necessary for discovery? Or is that just a procedural matter in the two different court systems? It is a procedural matter in two different court systems, and it could eventually go to, you know, if we had an argument on 2254E2 about having an evidentiary hearing and whether or not he attempted to develop facts in State court. But this is not a question of whether access to the notes is ordered. We're not ruling on the Brady claim itself, to which we owe a deference, and we clearly do under AEDPA. This is just, do we get access to material as a discovery matter? If this Court is now expanding the COA to address the procedural issue, which I think you're doing, then yes. It becomes a question of whether or not the district court correctly applied the law on Rule 6 discovery. And I would submit that there is no deference required in that regard. I mean, that's – that is a procedural issue for the district court. Do you know whether the witness is still living? Mr. Soto, sir? Yes, sir. I've talked to him. And does his – do his materials still exist in their original condition? I … Was not disclosed. I know that Mr. Soto – what I can tell the Court is that Mr. Soto has gone and looked at his file and reviewed the materials at my request. Okay. But I can't go beyond that. Okay. Fair enough. So, Your Honor, basically, the problem is that even if a unique gunshot residue particle is somehow discovered from all these printouts, and we're not conceding that that's what these printouts and notes will ever show, the best that can be said is that either Mr. Fan – or Mr. Twan was – had fired a weapon, was in the vicinity of a weapon that was fired, or, just as importantly, could have picked up that gunshot residue through transfer. Gunshot residue is something that is highly transferable. The particles are very fine. They're minute like dust. And it can exist in a car, for example. And we know that Moe left in Mr. Twan's car. He was seen fleeing the scene. Gunshot residue can be found long after it's been transferred to some surface in the car. We also know that Twan was seen at a place called Shorty's. Do we have in the record any evidence that would tell us where on Mr. Twan Huang the residue existed? That is to say, was it on the back of his hand, on his palm, on his wrist, on his face? I mean, do we know anything about where that residue was taken? Your Honor, my recollection of the testimony is simply that it was found on the hands itself. I'm not sure if it's been found on the surface. And depending on where it is on the hand, that might suggest some manner of taking it. For example, if it shows up on the palm, that might suggest that he got it off the door or shook hands with somebody. I'm not qualified to answer that question. We just don't know. Might that be in the notes? I don't know, Your Honor. Okay. Could I ask you to elaborate a little bit down the line you were going, assuming that, at best, Mr. Soto would have to say that there was a greater probability, even though there were other explanations for the residue being on his person. Why in this close, because you talked about in these gang cases and gestured, you know, showing how everybody's basically attacking each other. And that clearly occurred in this case. There were recantations and so on and so forth. Why would Mr. Soto's testimony, if enhanced to increase the probability, that Juan might have been the shooter? Why would that not have been significant for the jury? His testimony already, Your Honor, was that he found particles that were consistent with gunshot residue, but just simply not unique to it. But if it's a stronger one that there's not consistent with, but it's a greater level of probability. I would submit, Your Honor, that based on all the evidence, the fact that you still cannot say that he shot the weapon. Well, that's true. And there are. That's true. But this is a trial where there's all this conflicting evidence, where there is strong, at least, eyewitness testimony at the beginning, to the extent eyewitness testimony is ever strong, to suggest that it was reasonable to believe that he was the shooter. Why wouldn't that be a critical factor in the jury's weighing of the evidence, particularly unless the record's been mischaracterized? I can't remember the closing arguments, but to the extent the State was arguing that, they could basically ignore Soto's testimony. I would submit, here, I think Your Honor's question is jumping the gap, though, over to also the merits of the Brady claim. Well, that's why we have this fuzzy area. The question is, how much is not the equivalent? Is the 6A discovery standard the same as Brady, or is it something less, but reasonable enough to show that if he got it and is right, that then he could make a solid Brady claim? He's shown no indication, though, Your Honor, that he is right. He's offered no reason to say that Mr. Soto's wrong. The strongest reason he gives that Mr. Soto's wrong is that Mr. Soto is relatively new at performing GSR tests, but he didn't question his qualifications at the time of trial. Although, I have to say that another reason, whether strong or not, is the continuing refusal ever to hand over the notes. It is problematic for the State. Yes, it is, Your Honor. I don't deny that. But I have to be very careful, I think, in what I say, because what I don't want to do is somehow have it come back and later be said that I've conceded the Brady claim. No, I'm not trying to get you to concede. I think the problem, our own case law and the Supreme Court case law tends to make it easy to conflate the two. And I'm trying to figure out whether there's a way to separate discovery from the fact that Mr. Soto's notes were favorable, and therefore, a Brady violation had in fact occurred. Essentially, what Mr. Pham is doing, he's just shooting in the blind, saying, well, you know, gosh, maybe if I can get my hands on Mr. Soto's notes, maybe I'll find something. Then I have tried a lot of cases with experts, not in the criminal context, I'll admit.  Protocol, information about what the expert did so that I felt good about what the expert said was right. Yes, sir. And when I was prosecuting, that's exactly what I wanted to do. And doing, you know, death penalty evidentiary hearings and so forth, the same thing. But again, we're talking about the habeas case here and whether or not he's shown any reason that there's something wrong with what Mr. Soto's done. And that's our position, that he hasn't shown that. And I see my time is up. One question, and that is, I think I heard you give the answer to that. If we conclude that this discovery issue is not within the COA as granted, and I think it's an arguable question, that it may not well have been. I mean, it's subsumed in a way, but COA says Brady, it doesn't say discovery. If we conclude that it's not within the COA and that the only reason it could be in the COA, are you comfortable with the briefing that you have provided on the discovery and argument that you provided on that question? Yes, Your Honor. You have an opportunity to respond in briefing and in argument, and I want to make sure you think you've had enough of an opportunity. Based on what has been raised to date, I believe I have. Yes, sir. Okay. That's not to say how we're going to rule on it. I just want to make sure as to procedural matters on that question. Yes, sir. Okay. Thank you. We would ask that the district court's judgment be affirmed, Your Honor. Thank you. Just a few points, Your Honor. The first point is to say that it appears that all of us are in violent agreement about one thing, and that is Your Honor's experience, counsel's experience, and my experience is that when you deal with experts, you get the notes. That's the way you do it. You don't just look at the report because the report says here's my conclusion. You can't possibly attack a conclusion. You'll look at the notes. That's all my client sought to do, and that's all he's seeking to do now. That's the state of the art. That's how you do it. I can give Your Honor a little information about the co-defendant, Nguyen. He was tried as an aider and abetter. There was no personal use finding as to Nguyen. The personal use of a firearm findings were as to Mole and my client. So there was no issue as to whether Nguyen may have been that second shooter. So the theory was then, as I finally got myself down to it, the theory was it Pham or was it Wong Wong? Yes, that's the defense theory, and that's the factual question on which the case hinged. The third point gets at Your Honor's question, and that is how do you distinguish the merits from the discovery issue? And it is a thorny one, and I've looked at this, and my only answer really is to look at Bracey. Because in Bracey, the Supreme Court says you may not succeed, but we're going to give you a discovery. And I don't think they'd have said that if discovery was truly a children's horse for success on the merits. So I think that Bracey has something to say on that question. And the final point is on the COA issue that counsel raised. You know, I understand the court's concern. I understand counsel's concern. I think we all just assumed it was part of the mix. I will call the court's attention, though, to Murdoch versus Castro. Fortunately, I guess for Petitioner in this case, in Murdoch they set forth what the certificate of appealability was granted on. It was granted on whether appellant's federal constitutional rights were violated when the trial court ruled the prosecution witness's letter was protected by the attorney-client privilege. In other words, the COA in Murdoch was granted on the constitutional question. Nevertheless, the Murdoch decision dealt with, are you entitled to discovery? There was no certificate of appealability issue in Murdoch. I don't really think there is here. The matter is fully briefed before the court. Unless there's any other questions, I'm happy to submit it. No questions. Thank you, Your Honor. Further questions? Thank both sides for, I thought, exceedingly good arguments on both sides. Yes. Not to single out the State, but I do, in favoritism, but I hope you'll take back to your superiors and colleagues that you set a very good example of the kind of argument that at least this judge finds beneficial from the State. Sometimes your colleagues don't always seem to have a little bit of a bad attitude at times. And I'm not to trash anybody, but we do often get asked for feedback from counsel, particularly our institutional litigants, and it's much more effective to treat this as a conversation than as an adversarial relationship. So I appreciate your fine performance, and you can communicate your kudos back to your colleagues. Both sides. Both sides. Thank you very much. The case of Fahn v. Terhune is now submitted for decision.
judges: Beezer, W. Fletcher, Fisher